UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

TIMOTHY FINLEY, #266147,                    Case No. 2:18-cv-00100

               Plaintiff,                    Hon. Gordon J. Quist
                                             U.S. District Judge

    v.

ERICA HUSS, et al.,

               Defendants.
_____/

## REPORT AND RECOMMENDATION

### I.    Introduction

Plaintiff Timothy Finley, who is a prisoner in the Michigan Department of Corrections (MDOC), suffers from a number of serious psychiatric disorders. In 2016, while incarcerated at the Marquette Branch Prison (MBP), Finley repeatedly obtained razor blades, which he used to cut himself. He also swallowed these razor blades, which resulted in several emergency surgeries. During this same period, Finley committed a number of violations of prison rules. Thus, prison officials, and specifically Defendants here – Deputy Warden (DW) Huss, and Acting Deputy Warden (ADW) Schroeder – were confronted with a dilemma: what to do with a mentally ill prisoner who refused to follow prison rules and could not be housed in the general prison population. They chose – at least for a 3-month period at the end of 2016 and early 2017 – to place Finley in administrative segregation, a form of imprisonment involving periods of solitary confinement.

1

Finley claims that Defendants violated his rights by placing him in administrative segregation rather than transferring him to a mental health unit. Finley says Defendants were deliberately indifferent to his serious medical issues and subjected him to cruel and unusual conditions of confinement, in violation of the Eighth Amendment, violated his rights to due process clause of the Fourteenth Amendment during the hearings that resulted in his placement in administrative segregation, and denied him services offered by the prison, in violation of the Americans With Disabilities Act (ADA) and the Rehabilitation Act (RA).

This report and recommendation addresses Defendants' motion for summary judgment (ECF No. 83) and Finley's motion to unseal his exhibit 18 (ECF No. 93).

In Defendants' motion for summary judgment, they argue that there is no genuine issue of fact (1) that Finley failed to satisfy the objective and subjective components of his Eighth Amendment deliberate indifference and conditions of confinement claims, (2) that Finley failed to establish a violation of his rights under the due process clause of the Fourteenth Amendment, (3) that both of Finley's constitutional claims are barred by the doctrine of qualified immunity, and (4) that Finley failed to show discrimination based on his disabilities under the ADA and the RA.  (ECF No. 84.)

In response, Finley argues that there are genuine issues of material fact regarding his claims, and that Defendants are not entitled to the protections of qualified immunity.  (ECF No. 88.)  Regarding the Eighth Amendment claims, Finley points to his documented history of mental illness, his history of self-mutilation, and

Defendants' conduct as evidence that establishes genuine issues of fact for both the objective and subjective components of his claims.   Regarding his Fourteenth Amendment claim, Finley argues that there are genuine issues of fact as to whether a liberty interest was implicated and whether he received all the necessary procedural protections during his two Security Classification Committee (SCC) hearings.  Regarding the ADA and RA claims, Finley contends that his mental illness is inextricably intertwined with his misconduct behavior.  Consequently, he states that there are genuine issues of fact as to whether Defendants discriminated against him because of his disability.  And finally, Finley asserts that Defendants are not entitled to the protections of qualified immunity because of controlling case law, or because there is a robust agreement among persuasive authorities that would place a reasonable officer on notice as to the unconstitutionality of his or her conduct.

In reply, Defendants contend that summary judgment is appropriate because the pertinent facts of the four claims are undisputed.  (ECF No. 92.)  Defendants also argue that the application of qualified immunity is appropriate.

In support of Finley's motion to unseal the photographs in his exhibit 18, he argues that the public's interest in the photos strongly outweigh any prison security concerns.  (ECF No. 93.)  In response, Defendants argue that there is no reason for the parties to deviate from their earlier stipulation to file the photos under seal, and that the public interest in the photos are outweighed by prison security concerns. (ECF No. 98.)  Finley filed a reply that includes information from a person Finley identifies as an expert.  (ECF No. 99.)

The undersigned is aware of the difficulties prison officials face when deciding how to manage a mentally ill prisoner who is engaging in self-harm while also failing to follow prison rules.  Nevertheless, as an initial matter, the undersigned concludes that there are genuine issues of fact as to Finley's Eighth Amendment claim.  Finley's well-documented history of mental illness and self-mutilation triggers a genuine issue as the objective component of these Eighth Amendment claims; and Defendants' decisions to classify Finley into administrative segregation despite Finley's history is sufficient to create a genuine issue as to the subjective component.  The undersigned concludes, however, that there are no genuine issues of fact as to Finley's Fourteenth Amendment claim or his ADA and RA disability discrimination claims.  Based on the undisputed evidence, no liberty interest is implicated to establish a cognizable Fourteenth Amendment claim.  Furthermore, the record before the Court indicates that Finley did receive due process regarding his SCC hearings, at least as to the September 27, 2016 hearing.  But, regardless of these conclusions, the undersigned finds that Defendants' decisions with regard to handling a mentally ill prisoner who has also violated prison rules on numerous occasions are protected by the doctrine of qualified immunity.  Finley's constitutional claims are barred because there is no controlling authority nor sufficiently robust agreement amongst persuasive authorities that would inform reasonable prison officials that classifying a mentally ill prisoner into administrative segregation is unconstitutional.

In addition, based on the undisputed evidence, Finley's ADA and RA claims fail because the evidence shows that Finley was placed into administrative segregation because of his misconducts and not his disability.

The undersigned respectfully recommends that the Court grant Defendants' summary judgment motion (ECF No. 83), and grant in part and deny in part Finley's motion to unseal his exhibit 18 (ECF No. 93).   If the Court adopts this recommendations, Finley's case will be dismissed.

## II.    Additional Relevant Procedural History

Prior to the filing of this action, Finley – as a *pro se* litigant – filed an earlier action that asserted the same claims against the same Defendants.[1]  (Case No. 2:16-cv-253, ECF No. 1.)  The district court initially dismissed the case in a screening opinion and order, concluding that Finley had failed to state an Eighth Amendment and Fourteenth Amendment claim.  (*Id.*, ECF Nos. 12, 13.)  The district court also denied Finley's request to amend his complaint.  Finley appealed that dismissal.  The Sixth Circuit concluded that Finley had stated an Eighth Amendment claim.  *Finley v. Huss*, 723 F. App'x 294, 299 (6th Cir. 2018).  The court of appeals vacated the district court's judgment and remanded the case with leave for Finley to amend his complaint.  *Finley v. Huss*, 723 F. App'x at 299.

---

[1]    Finley has filed several lawsuits regarding events that occurred while he was housed at MBP.  Unless stated otherwise, all citations to docket entries are drawn from *Finley v. Huss*, W.D. Mich. Case No. 2:18-cv-100.  Citations to documents from Finley's other cases will include the case number for the case.

On remand, the district court appointed counsel for Finley. (Case No. 2:16-cv-253, ECF No. 27.) The district court ordered Finley to file an amended complaint within 28 days. (Case No. 2:16-cv-253, ECF No. 32.) But, instead of filing an amended complaint, Finley voluntarily dismissed the action. (Case No. 2:16-cv-253, ECF No. 33.)

On June 28, 2018, Finley revived his claims against Defendants when he filed this action in federal court. (ECF No. 1.) On August 16, 2018, Finley filed an amended complaint. (ECF No. 10.) Defendants filed answers that included a number of affirmative defenses. (ECF Nos. 16, 21.) Later, Defendants filed an answer to the amended complaint. (ECF No. 22.)

On August 23, 2018, in the present case, the district court ordered Defendants to file a motion to consolidate this matter with two other actions: *Finley v. Mleko*, Case No. 2:17-cv-159 and *Finley v. Salmi*, Case No. 2:17-cv-149. (ECF No. 11, PageID.75.) This Court pointed out that those cases were also initiated by Finley and were based on claims relating to his "mental health treatment and prolonged solitary confinement" while housed at MBP. (*Id.*) Defendants filed the motion to consolidate along with a supporting brief. (ECF No. 18, 19.) The Court ultimately ordered the consolidation of *Finley v. Mleko* (Case No. 2:17-cv-159) and *Finley v. Salmi* (Case No. 2:17-cv-149), but ordered *Finley v. Huss* (Case No. 2:18-cv-100) to proceed separately. (ECF No. 26.) Accordingly, the issues in this action are not consolidated with any of Finley's other cases.

The case entered early mediation on January 9, 2019, but failed to settle.  (ECF Nos. 44, 50.)

Defendants filed their motion for summary judgment and supporting brief on November 27, 2019that is currently before the Court.  (ECF No. 83, 84.)

## III.   Statement of Undisputed Facts

There are four relevant areas of undisputed facts: (1) Finley's history of mental illness and required medical treatments, (2) Finley's lengthy misconduct record, (3) the dates and personnel involved during Finley's September and October 2016 SCC hearings, and (4) the conditions under which Finley was held in administrative segregation.

First, the parties do not dispute that Finley was diagnosed with several mental illnesses or that Finley required medical treatment due to his self-mutilating behavior.  It is evident from the record that MDOC placed Finley within its mental health caseload because of his mental health diagnoses.  Because he was on this caseload, Finley was interviewed by a Qualified Mental Health Professional (QMHP) before his initial SCC hearing, and a QMHP was required to be present at the two relevant SCC hearings.  It is equally evident and undisputed that Finley has a history of self-mutilation.   Finley underwent surgery to remove razorblades that he swallowed on two separate occasions – on September 1, 2016 and September 29, 2016. (ECF No. 88-5, PageID.725, 735.)  Moreover, from March to September 2016, QMHP consistently evaluated Finley as being either a moderate or intermediate risk for suicide.  (*See* ECF No. 88-5.)

7

Second, the parties do not dispute that Finley's misconduct record is extensive. (*See* ECF No. 84-2, PageID.402-411.)    As of June 15, 2018, Finley was administratively adjudicated guilty of 340 different misconducts, which included possession of a dangerous weapons, assault and battery, threatening behavior, disobeying orders, and sexual misconduct.  (*Id*.)  Leading up to the September and October 2016 SCC hearings, Finley received two misconduct tickets that resulted in those SCC hearings.

On September 18, 2016, Finley received a Class I misconduct for possession of a dangerous weapon (a razorblade).  (ECF No. 84-2, PageID.384.)  On September 26, 2016, Finley attended a misconduct hearing where he was administratively adjudicated guilty despite arguing that his mental illness caused his misconduct.  (ECF No. 84-2, PageID.402.)  The next day, DW Huss presided over the SCC hearing where Finley was initially reclassified into administrative segregation.

And on October 5, 2016, Finley received a Class II misconduct ticket for disobeying a direct order.  (ECF No. 84-2, PageID.388.)  Finley was administratively adjudicated guilty of the misconduct during a hearing on October 10, 2016.  (ECF No. 84-2, PageID.402.)  Finley did not attend that misconduct hearing.  The next day, ADW Schroeder presided over Finley's second SCC hearing, where it was determined that he should be held in administrative segregation.

Third, there is no dispute that each Defendant presided over one of Finley's two relevant SCC hearings.  DW Huss presided over the September 27, 2016 SCC hearing; ADW Schroeder presided over the October 10, 2016 SCC hearing; and QMSP

8

Hares was present at both SCC hearings.  With respect to the three procedural protections required – receiving notice of the misconduct charged, a hearing where the prisoner can object and present evidence, and meaningful periodic reviews – Finley only challenges the sufficiency of the notice he receive for his September SCC hearing, his inability to attend the October SCC hearing, and the meaningfulness of the numerous periodic reviews he received.  (*See* ECF No. 88, PageID.571-574.)  And despite any disagreement as to the meaningfulness of Finley's periodic reviews, it is undisputed that he received numerous periodic reviews while held in administrative segregation.  (*See* ECF No. 84-2, PageID.393-400 (documenting MDOC Segregation Behavior Reviews on October 27, 2016; November 3, 10 and 17, 2016; December 1 and 29, 2016; and January 11, 2017).)

Fourth, the timing and duration of Finley's stays in administrative segregation are undisputed.  Following the September 27, 2016 SCC hearing, Finley spent approximately two days in administrative segregation.  On September 29, 2016, Finley was rushed to receive medical treatment outside of MBP.  When Finley returned to MBP on October 5, 2016, after receiving medical treatment, Finley was held in observation until the October 10, 2016 SCC hearing.  At that point, Finley was returned to administrative segregation and held there until January 11, 2017.

## IV.    Summary of Plaintiff's Allegations

The table below lists Finley's claims and a summary of the alleged facts supporting the claims.

9

| Claim No. | Defendant | Claim | Date or Date Range of Incident(s) | Factual Allegation |
|---|---|---|---|---|
| 1 | DW Huss and ADW Schroeder | 8th Amendment Cruel and Unusual Punishment | 9/27/26 to 1/11/17 | On September 27 through January 11 of 2017, Defendants subjected Finley to cruel and unusual conditions of confinement.  In the complaint, Finley does not clearly define the facts on which this single claim is based. Instead, he advances possibly two theories: (1) that Defendants were deliberately indifferent to his needs for mental treatment, and (2) that Finley was not provided basic necessities like light or exercise while in administrative segregation. |
| 2 | DW Huss and ADW Schroeder | 14th Amendment Procedural Due Process | 9/27/26 to 1/11/17 | Finley claims that Defendants failed to provide him with sufficient notice and an opportunity to present a defense during SCC hearings on September 27 and October 10, 2016. Also, Finley claims that Defendants failed to give him meaningful reviews of his then on-going administrative segregation. |
| 3 | DW Huss and ADW Schroeder | Disability Discrimination under the ADA | 9/27/26 to 1/11/17 | Defendants placed Finley into administrative segregation on the basis of his mental illness. |
| 4 | DW Huss and ADW Schroeder | Disability Discrimination under the RA | 9/27/26 to 1/11/17 | Defendants placed Finley into administrative segregation on the basis of his mental illness. |

## V.    Summary Judgment Standard

Summary judgment is appropriate when the record reveals that there are no genuine issues as to any material fact in dispute and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56; *Kocak v. Comty. Health Partners of Ohio, Inc.*, 400 F.3d 466, 468 (6th Cir. 2005).  The standard for determining whether summary judgment is appropriate is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *State Farm Fire & Cas. Co. v. McGowan*, 421 F.3d 433, 436 (6th Cir. 2005) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242,

251-52 (1986)). The court must consider all pleadings, depositions, affidavits, and admissions on file, and draw all justifiable inferences in favor of the party opposing the motion. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## VI.     Finley's Eighth Amendment Cruel and Unusual Punishment Claim

As noted in Section IV of this R&R, Finley asserts two theories as to how his Eighth Amendment rights were violated by his placement in administrative segregation: (1) that Defendants were deliberately indifferent to his need for medical treatment regarding his mental illness, and (2) that Finley was denied basic necessities like light and exercise, i.e. that the conditions of his confinement violated the Eighth Amendment.  Regardless of which theory Finley intends, the undersigned concludes that genuine issues of material fact exist as to Finley's Eighth Amendment claims.

### a.  *Deliberate Indifference Theory*

The Eighth Amendment prohibits the infliction of cruel and unusual punishment against those convicted of crimes.  U.S. Const. amend. VIII.  The Eighth Amendment obligates prison authorities to provide medical care to incarcerated individuals, as a failure to provide such care would be inconsistent with contemporary standards of decency.  *Estelle v. Gamble*, 429 U.S. 102, 103-04 (1976).  The Eighth Amendment is violated when a prison official is deliberately indifferent to the serious medical needs of a prisoner.  *Id.* at 104-05; *Comstock v. McCrary*, 273 F.3d 693, 702 (6th Cir. 2001).

A claim for the deprivation of adequate medical care has an objective and a subjective component. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). To satisfy the objective component, the plaintiff must allege that the medical need at issue is sufficiently serious. *Id*. In other words, the inmate must show that he is incarcerated under conditions posing a substantial risk of serious harm. *Id*. The objective component of the adequate medical care test is satisfied "[w]here the seriousness of a prisoner's need[ ] for medical care is obvious even to a lay person." *Blackmore v. Kalamazoo Cty.*, 390 F.3d 890, 899 (6th Cir. 2004); *see also Phillips v. Roane Cty.*, 534 F.3d 531, 540 (6th Cir. 2008). Obviousness, however, is not strictly limited to what is detectable to the eye. Even if the layman cannot see the medical need, a condition may be obviously medically serious where a layman, if informed of the true medical situation, would deem the need for medical attention clear. *See, e.g., Rouster v. Cty. Of Saginaw*, 749 F.3d 437, 466, 451 (6th Cir. 2014) (holding that a prisoner who died from a perforated duodenum exhibited an "objectively serious need for medical treatment," even though his symptoms appeared to the medical staff at the time to be consistent with alcohol withdrawal); *Johnson v. Karnes*, 398 F.3d 868, 874 (6th Cir. 2005) (holding that prisoner's severed tendon was a "quite obvious" medical need, since "any lay person would realize to be serious," even though the condition was not visually obvious).

The subjective component requires an inmate to show that prison officials have "a sufficiently culpable state of mind in denying medical care." *Brown v. Bargery*, 207 F.3d 863, 867 (6th Cir. 2000). Deliberate indifference "entails something more than

mere negligence," but can be "satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." *Farmer*, 511 U.S. at 835. "[T]he official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 837.

With respect to the objective component, the question is whether Finley's need for medical treatment created an obvious risk of substantial harm if he were placed into solitary confinement? *See Bays v. Montmorency Cty.*, 874 F.3d 264 (6th Cir. 2017); *Finley*, 723 F. App'x 294. Two Sixth Circuit cases are instructive as to why there is a genuine issue as to why the objective component is satisfied: *Bays*, 874 F.3d 264 and *Finley*, 723 F. App'x 294.[2]

In *Bays*, the plaintiff had a host of "severe psychological symptoms" that included "paranoia, anxiety, anger, troubling thoughts, self-destructive wall-punching, the hearing of voices, and violent impulses directed towards other inmates." *Bays*, 874 F.3d at 268. The court concluded that those symptoms, if proven, would satisfy the objective component because the symptoms clearly signal a serious risk of substantial harm. *Id.*

In the earlier *Finley* case, the Sixth Circuit held that "the facts in *Bays* were not nearly this problematic" as compared to *Finley*. 723 F. App'x at 298. The court specifically held that objective component was satisfied because a few days prior to

---

[2]    Although the court addressed the dismissals of *Bays* and *Finley* under Fed. R. Civ. P. 12(b), the court's reasoning is applicable here.

being reclassified into solitary confinement, Finley allegedly swallowed a razor blade. *Id*. "That [wa]s more than enough to indicate a severe psychological disorder. *See Grabow v. Cty. of Macomb*, 580 F. App'x 300, 307 (6th Cir. 2014) (holding that a plaintiff who exhibits suicidal tendencies during detention has satisfied this element)." *Finley*, 723 F. App'x at 298.

Here, even before being placed in administrative confinement, Finley's medical record shows that he had swallowed a razorblade. (ECF No. 88-5, PageID.725.) After that, Finley was taken to an emergency room and the razorblade was removed. That instance alone would create a genuine issue of fact as to whether the objective component was satisfied. But that instance did not occur in a vacuum. Instead, Finley's medical records shows that he was on moderate to high suicide risk[3] from April 21, 2015 to November 7, 2016. (*See* ECF No. 88-5.) Due to the voluminous evidence of self-harm and suicidal behavior, the undersigned concludes that there is a genuine issue of fact as to whether the objective component was satisfied.

Turning to the subjective component, the relevant question has two parts: (1) whether Defendants were aware of the obvious serious risk of substantial harm, and (2) whether Defendants were deliberately indifferent to that risk. *See Farmer*, 511 U.S. at 837. The undersigned concludes that there is a genuine issue of fact as to these components.

---

[3]    According to Salmi and Hares, there are four levels of suicide risk: low, intermediate, moderate, and high. (ECF No. 88-7, PageID.779-780; ECF No. 88-8, PageID.800.) Moderate and high risk are the two highest levels. When a prisoner is determined to be either a moderate or high suicide risk, the prisoner is placed under observation and his or her cell must be emptied of all personal property. (*Id.*)

Regarding the first part, as shown below, Defendants admit that they were aware of Finley's self-harming and suicidal behavior before classifying Finley into administrative segregation.

### Relevant Excerpts from DW Huss's Deposition

```
 1   A    We have a policy directive that outlines all of the
 2        things that we need to consider when making such a
 3        determination, to include the prisoner's prior history,
 4        the current behavior, and the potential to honor the
 5        trust implicit in a less restrictive environment. And
 6        one of the factors that we also look at is their mental
 7        health and the determination from outpatient mental
 8        health as to what's in their best interest.
 9   Q    Were you part of the SCC during September 2016?
10   A    Yes.
11   Q    Were you part of the SCC on September 27, 2016?
12   A    Yes.
```

(ECF No. 84-5, PageID.446.)   As shown above, DW Huss testified that she participated in the SCC on September 27, 2016, which required her to review Finley's history, current behavior, and mental health.

```
 8   A    I -- As the security classification chairperson, I also
 9        review all of the misconducts.  I would have reviewed
10        his misconduct hearing packet prior to going down to
11        the interview.
12   Q    And what would the misconduct hearing packet include,
13        specifically?
14   A    It would include the hearing investigator's report.  It
15        would include the document from the QMHP.  It would
16        include any witness statements, anything like that.
```

(*Id.*, PageID.448.)  As shown above, DW Huss explained that, as the chairperson of the SCC, she reviewed Finley's misconduct packet, which included an assessment from a QMHP.

```
4  Q   -- 2016?  Is it true that this document states that
5      prolonged segregation placement is likely to
6      deteriorate his mental health status?
7  A   Yes.
8  Q   Is it true that this document also states that the
9      prisoner is on the mental health caseload?
0  A   Yes.
```

(*Id.*, PageID.450.)  As shown above, when questioned about the assessment from the QMHP, DW Huss confirmed that the assessment contained a recommendation warning that prolonged segregation would be detrimental to Finley's mental health and that Finley is on the mental health caseload.

```
5  Q   Why do you think that it would be best to place
6      Mr. Finley in administrative segregation?
7  A   There is restricted access to a lot of the things that
8      he was using to manipulate the process and harm
9      himself.
```

(*Id.*, PageID.455.)  Finally, DW Huss described administrative segregation as being the best place for him because it has restricted access, which might help prevent Finley from mutilating himself.  Clearly, DW Huss was aware of Finley's history of self-mutilation.

**Relevant Excerpts from Schroeder's Deposition**

```
Q    Now, I would like to ask you some questions about your
     interaction withs Mr. Finley.  Do you remember
     Mr. Finley?
A    Yes.
Q    Why do you remember him?
A    I remember, when I was the administrative assistant,
     his name coming across my desk in reference to him
     doing self-injurious behavior and being transported to
     the University of Michigan for medical.  After that, I
     recall seeing Mr. Finley upon his return, when I was in
     the acting position of deputy warden and interviewing
     him.
```

(ECF No. 84-7, PageID.480.)

As shown above, ADW Schroeder admitted to being aware of Finley's self-injurious behavior and how that behavior resulted in Finley eventually being taken to the University of Michigan for medical treatment prior to presiding over Finley's second SCC hearing.

```
19   Q    Were you aware that before your hearing on October 5th,
20        2016 -- Were you aware that in September Finley was in
21        and out of the prison and in numerous hospitals?
22   A    I was aware that he was sent to Escanaba to see a
23        specialist, and I was aware of his transfer to the
24        University of Michigan.
```

(*Id.*, PageID.481.)  Schroeder again admitted knowing that Finley was taken out of the prison for medical treatment relating to his self-mutilation.

Based on the above excerpts, it is the opinion of the undersigned that there is a genuine issue of fact as to whether Defendants were aware of a serious risk of substantial harm.

17

Regarding the subjective component, the record also demonstrates a genuine issue of fact as to whether Defendants were deliberately indifferent to that serious risk of substantial harm.  This issue is more complicated.  Defendants argue that they were not deliberately indifferent to any serious risk of substantial harm because a member of the QMHP – Mark Hares – was present at Finley's SCC hearings and the QMHP member never voiced an objection to Finley being reclassified into administrative segregation.  (ECF No. 84, PageID.350-351.)

In response, Finley contends that Defendants are not entitled to summary judgment because the record shows that they were aware of Finley's history of self-harming and suicidal behavior when they chose to place Finley into administrative segregation.  (ECF No. 88, PageID.559-568.)  Finley points to his medical history and Mandi Salmi's misconduct assessment report for the proposition that they would have informed Defendants about the risk of harm by placing him into administrative segregation.

In reply, Defendants argue that Finley has "no evidence to suggest that DW Huss or ADW Schroeder knew and appreciated that his mental health would be adversely impacted by segregation."  (ECF No. 92, PageID.922-923.)  Defendants add that ADW Schroeder's conduct cannot be considered deliberately indifferent because days after receiving an email from Salmi that requested Finley's move into the Interim Care Program (ICP), his name was placed on the list.  (*Id.*, PageID.924.)

As explained in the first part of the subjective component's analysis, there is ample evidence to show that Defendants were aware of Finley's propensity to engage

in self-harming and suicidal behavior.  As a result, the question becomes whether that evidence "presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one [Defendants] must prevail as a matter of law." *McGowan*, 421 F.3d at 436 (quoting *Anderson*, 477 U.S. at 251-52).  The undersigned concludes that there is such a sufficient disagreement that it should be submitted to a jury.

On one hand, it is evident that during Finley's two relevant SCC hearings[4], the QMHP member of SCC – Mark Hares – chose not to object to Finley's placement into administrative segregation.  (ECF No. 88, PageID.806.)  On the other hand, in Defendants' depositions, they testified that they were aware of Finley's mental health, his history, Salmi's recommendation that Finley not be exposed to prolonged administrative segregation, and of alternatives to administrative segregation.  (*See* ECF No. 84-5, 84-7.)  DW Huss stated that administrative segregation may be best for Finley because the restricted access may help prevent him from accessing razorblades.  (ECF No. 88-4, PageID.455.)  Also, it should be noted that ADW Schroeder presided over the October SCC hearing and determined that Finley should be returned to administrative segregation five days after he returned from the hospital for swallowing a razorblade during his earlier stint in administrative segregation.  Thus, ADW Schroeder was aware of this earlier incident.

---

[4]    One was chaired by DW Huss on September 27, 2016 and the other one was chaired by ADW Schroeder on October 10, 2016.

In Finley's case, Defendants were confronted with a difficult situation:  how to deal with a prisoner who has serious mental health issues, who cuts himself with razor blades and swallows the blades, who cannot be incarcerated in general population, and who continues to violate prison rules.  Given the evidence before the Court, the undersigned cannot conclude that no genuine issue of material fact exists with respect to the question of whether Defendants were deliberately indifferent to Finley's serious medical and mental health issues.

### b.  *Lack of Basic Necessities / Conditions of Confinement*

Under his second theory, Finley points to the specific conditions of his confinement as the violation of his Eighth Amendment right.  These conditions allegedly resulted in extreme isolation, a lack of exercise, and a lack of light.  (*See* ECF No. 88, PageID.552-556.)  To establish a cognizable cruel and unusual Eighth Amendment claim, Finley must still establish the objective and subjective components.  *See Farmer*, 511 U.S. at 834.

To satisfy the objective component, Finley must show that there is an obvious substantial risk of serious harm because of the conditions of confinement.  For the same reasons outlined above with respect to Finley's deliberate indifference claims – specifically, Finley's diagnosed mental illnesses, his history of self-mutilation (particularly while in administrative segregation), and QMHP Salmi's recommendation against prolonged time in administrative segregation – the undersigned concludes that there is a genuine issue of fact as to whether there was an obvious substantial risk of serious harm due to conditions of confinement.

To satisfy the subjective component, Finley must show that Defendants were aware of the obvious substantial risk of serious harm caused by the conditions of confinement and that they acted indifferently to the risk.  In the opinion of the undersigned, there is a genuine issue of fact as to whether the Defendants were aware of a substantial risk of serious harm caused by the conditions of confinement and acted indifferently for two reasons.

First, as noted above, Deputy Warden Huss was aware of Finley's self-mutilating behavior and QMHP Salmi's recommendation that prolonged confinement in administrative segregation would be detrimental to Finley's mental health.  (ECF No. 84-5, PageID.449-450.)    ADW Schroeder was also aware of Finley's self-mutilating behavior and Finley's recent stay at the University of Michigan's medical center because he swallowed a razorblade while in administrative segregation.  (ECF No. 84-7, PageID.479.)    Second, as Deputy Warden and Acting Deputy Warden, Defendants were responsible for housing units, facilities, and the safety and security of these units and facilities.  (ECF No. 84-7, PageID.478.)    These housing units included the cells for prisoners classified into administrative segregation, which are described by an expert as being "extremely isolating."  (ECF No. 88-3, PageID.673.) Finley's cell was particularly isolating because its location was on the base level and its sally port area.  (*Id*.)  The cells in that location do not have any windows or access to natural light, and the sally port area prevented Finley from being able to communicate with his neighboring inmates.  (*Id*.)  Third, on September 29, 2016, two days after being classified into administrative segregation, Finley swallowed a

razorblade that necessitated an airlift to the University of Michigan's medical center for treatment.  (*See* ECF No. 88, PageID.688; ECF No. 84-7, PageID.481.)  Despite, that short and eventful stint in administrative segregation, ADW Schroeder decided to keep Finley in administrative segregation.  (ECF No. 84-8.)

Again, the undersigned is well aware of the difficulty posed by Finley's situation.  But, based on the forgoing evidence, the undersigned concludes that there is a genuine issue of fact as to whether Defendants were aware of and deliberately indifferent to a substantial risk of serious harm for Finley because of the conditions of confinement.

## VII.    Finley's Fourteenth Amendment Procedural Due Process Claim

Defendants argue that they are entitled to summary judgment (1) because Finley has failed to establish a liberty interest at issue and (2) because the evidence shows that he received sufficient procedural protections before being placed into administrative segregation.  It is the opinion of the undersigned that there is no genuine issue of fact that Finley failed to establish a liberty interest.  Consequently, the undersigned respectfully recommends that the Court dismiss Finley's Fourteenth Amendment procedural due process claim with prejudice.  However, if the Court should hold that there is a genuine issue of fact regarding a liberty interest, the undersigned concludes that Finley received all the procedural protections to which he was entitled for both SCC hearings.

### a.  *Liberty Interest*

The Supreme Court long has held that the Due Process Clause of the Fourteenth Amendment does not protect every change in the conditions of confinement having an impact on a prisoner.  *See Meachum v. Fano*, 427 U.S. 215, 225 (1976) (holding that the court "reject[s] at the outset the notion that any grievous loss visited upon a person by the State is sufficient to invoke the procedural protections of the Due Process Clause.").  In *Sandin v. Conner*, 515 U.S. 472, 484 (1995), the Court set forth the standard for determining when a prisoner's loss of liberty implicates a federally cognizable liberty interest protected by the Due Process Clause.  According to *Sandin*, a prisoner is entitled to the protections of due process only when a deprivation "will inevitably affect the duration of his sentence" or imposes an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin*, 515 U.S. at 486-87; *see also Jones v. Baker*, 155 F.3d 810, 812 (6th Cir. 1998); *Rimmer-Bey v. Brown*, 62 F.3d 789, 790-91 (6th Cir. 1995).

Indeed, confinement in administrative segregation "is the sort of confinement that inmates should reasonably anticipate receiving at some point in their incarceration." *Hewitt v. Helms*, 459 U.S. 460, 468 (1983), *abrogated on other grounds by Sandin*, 515 U.S. 472.  Thus, administrative segregation is considered atypical and significant only in "extreme circumstances." *Joseph v. Curtin*, 410 F. App'x 865, 868 (6th Cir. 2010).  Generally, courts will consider the nature and duration of a stay in segregation to determine whether it imposes an "atypical and significant hardship." *Harden-Bey v. Rutter*, 524 F.3d 789, 794 (6th. Cir. 2008).

23

In *Sandin*, the Supreme Court concluded that disciplinary segregation for 30 days did not impose an atypical and significant hardship. 515 U.S. at 484. Similarly, the Sixth Circuit has held that placement in administrative segregation for a relatively short period of time does not require the protections of due process. *Rimmer-Bey*, 62 F.3d at 790-91; *see Joseph*, 410 F. App'x at 868 (61 days in segregation is not atypical and significant). The Sixth Circuit has also held, in specific circumstances, that confinement in segregation for a much longer period of time does not implicate a liberty interest. *See, e.g.*, *Baker*, 155 F.3d at 812-23 (two years of segregation while the inmate was investigated for the murder of a prison guard in a riot); *Mackey v. Dyke*, 111 F.3d 460 (6th Cir. 1997) (one year of segregation following convictions for possession of illegal contraband and assault, including a 117-day delay in reclassification due to prison crowding).

Finley does not argue that the *length* of his administrative confinement created an atypical and significant hardship. (ECF No. 88, PageID.568-574 (citing *Harden-Bey*, 524 F.3d at 794).) Instead, he asserts that his mental health issues make him uniquely vulnerable to administrative segregation, thus making administrative segregation an atypical and significant hardship. (*Id.*) Finley's argument is inapposite to the Sixth Circuit's precedent. "Whatever the 'ordinary incidents of prison life' may encompass, they must be decided with reference to the particular prison system at issue, and can only be truly 'ordinary' when experienced by a significant proportion of the prison population." *Austin v. Wilkinson*, 372 F.3d 346, 355 (6th Cir. 2004), *aff'd in part and rev'd in part on other grounds*, 545 U.S. 209

24

(2005).  Essentially, Finley's argument focuses on whether his punishment was atypical and a significant hardship *for him*, while the Sixth Circuit's precedent focuses on whether Finley's punishment was atypical and a significant hardship when compared to the punishments and circumstances of fellow prisoners.

Other circuit courts have held that there are occasions where common conditions of confinement create atypical and significant hardships for plaintiffs.  *See Serrano v. Francis*, 345 F.3d 1071, 1079 (9th Cir. 2003) (where placing a wheel-chair bound prisoner into a non-wheelchair accessible cell, "*by virtue of his disability*, constituted an atypical and significant hardship on him"); *Delaney v. Selsky*, 899 F. Supp. 923, 927-28 (N.D.N.Y. 1995) (holding that confinement of an unusually tall prisoner in cramped quarters with a small bed created an atypical and significant hardship because the conditions aggravated a medical issue in his back); *see also Madrid v. Gomez*, 889 F. Supp. 1146, 1255 (N.D. Cal. 1995) (holding that it was unconstitutional to hold a mentally ill prisoner in Pelican Bay isolation unit*); Langley v. Coughlin*, 715 F. Supp. 522, 542 (S.D.N.Y. 1989) (holding that psychiatric evidence that prison officials fail to screen out  "from SHU those individuals who, by virtue of their mental condition, are likely to be severely and adversely affected by placement there" raises a triable Eighth Amendment issue).  In those situations, the plaintiffs had disabilities that made them uniquely vulnerable to conditions that would not otherwise serve as the basis for a liberty interest.  As noted above, under the Sixth Circuit's precedent, district courts do not analyze whether a prisoner is uniquely vulnerable to conditions that would not otherwise implicate a liberty interest.  Thus,

Finley has not shown that he has a liberty interest that was impacted by his classification to administrative segregation.

**b.  *Procedural Protections***

If the Court were to conclude that a liberty interest was implicated, then the undersigned concludes that there is no genuine issue of fact that Finley received all procedural protections as to his September SCC hearing, but that a genuine issue does exist with respect to his October SCC hearing.

As an initial matter, the parties disagree regarding what procedural protections Finley was entitled to receive and which he did receive during and prior to his September and October SCC hearings.  The case law is unclear as to what procedural protections prisoners are entitled to during SCC hearings.  However, in *Powell v. Washington*, 720 F. App'x 222, 227 (6th Cir. 2017), the Sixth Circuit upheld the dismissal of the lawsuit involving a prisoner who raised due process issues after being classified into administrative segregation following a SCC hearing.  When evaluating the sufficiency of the prisoner's notice and subsequent punishment, the Sixth Circuit analyzed the misconduct ticket and the misconduct hearing that come before a follow-on hearing like an SCC hearing.  As a result, the undersigned starts the due process analysis by looking to the protections that Finley was provided relating to his misconduct tickets and misconduct hearings, which led to the SCC hearings.

"Due process requires that the prisoner receive written notice of the charges against him at least 24 hours before the hearing, an opportunity to call witnesses and

present documentary evidence in his defense, and a written statement by the factfinder of the evidence relied on and the reasons for the disciplinary action." *Powell v. Washington*, 720 F. App'x 222, 227 (6th Cir. 2017) (citing *Wolff v. McDonnell*, 418 U.S. 539, 563-67 (1974)).   Should a prisoner be placed into confinement where a liberty interest was implicated, the prisoner "is entitled to periodic reviews of his status to ensure that the decision to continue his confinement in administrative segregation is supported by 'some evidence.'" *Powell v. Washington*, 720 F. App'x at 226 (citing *Harris v. Caruso*, 465 F. App'x 481, 484 (6th Cir. 2012)).

### i. The SCC Hearing Held on September 27, 2016

For the following reasons, the undersigned concludes that there is no genuine issue of fact that Finley was afforded all necessary procedural protections regarding his reclassification on September 27, 2016.

The court of appeals in *Powell* explained that prisoners received sufficient notice when the prisoners were issued misconduct tickets that stated the misconduct being charged.  720 F. App'x at 226-227.  The court of appeals added that the notice requirement will be satisfied when the ticket indicates a hearing date where the prisoners will be able to present evidence of a defense and object.  As shown below, Finley received a misconduct ticket that charged him with a Class I misconduct for possession of a dangerous weapon (a razorblade).  (ECF No. 84-2, PageID.384.)  The ticket also indicates that Finley was informed on September 19, 2016 that he would receive a hearing to present evidence and be able to object on September 21, 2016. (*Id.*)  The form also notes that witnesses and documents could be requested.  (*Id.*)

Consequently, there is no genuine issue of fact that the notice requirement was satisfied for the September misconduct hearing.



(*Id.*)

And, as the misconduct hearing report below shows, Finley received a hearing where he was able to object and present evidence of a defense. (ECF No. 84-2, PageID.379.) During the misconduct hearing, Finley did present a defense: his mental illness. (*Id.*)

| CLASS I MISCONDUCT HEARING REPORT | | | | | | Rev. 10/10 |
|---|---|---|---|---|---|---|
| Prisoner | Prisoner Name | | | Facility Code | Lock | Violation Date |
| 266147 | Finley | | | MBP | EB19 | 09/18/2016 |

**Charge(s)**
**Possession of Dangerous Contraband**

| If Charge Changed by Hearing Officer | Plea |
|---|---|
| | ☐ Guilty  ☒ Not Guilty |

| | | No Hearing Investigation Requested |
|---|---|---|
| Misconduct Report Read to and Discussed with Prisoner | ☒ (check if applies) | ☐ (check if applies) |
| Hearing Investigation Read to and Discussed with Prisoner | ☒ (check if applies) | |

**EVIDENCE/STATEMENTS IN ADDITION TO MISCONDUCT REPORT**

Prisoner's oral statement at hearing: not guilty. I have a mental illness.
The investigation was read and reviewed with prisoner which included:  prisoner's statement to H.I.; the prisoner also brought a two pg. statement to hearing expanding on the defense.  The misconduct sanction screening and assessment forms included.
The  prisoners had nothing to add.
The prisoner was told findings and was issued a sanction. The report was then typed outside the prisoner's presence.

**REASONS FOR FINDINGS**

The prisoner was issued a disposable razor which he was to use and return.  The officer came to collect it and the prisoner said he had flushed it.  Later he said he had swallowed it.  He claimed he was not responsible for his behavior. However, his QMHP indicated that while the prisoner is on the mental health case load he is responsible for his behavior.  Therefore the prisoner was able to control his actions and to conform to dept. rules and procedures.  he did not.  He is therefore guilty of the charge as he was to return the disposable razor in the form it was issued.  He did not.

**PROPERTY DISPOSITION (for contraband see PD 04.07.112)**

N/A

**FINDINGS**

| | | | | Reporting Code | |
|---|---|---|---|---|---|
| Charge No. 1 | ☒ Guilty | ☐ Not Guilty | ☐ Dismissed | Reporting Code | 030 |
| Charge No. 2 | ☐ Guilty | ☐ Not Guilty | ☐ Dismissed | Reporting Code | _____ |
| Charge No. 3 | ☐ Guilty | ☐ Not Guilty | ☐ Dismissed | Reporting Code | _____ |
| Charge No. 4 | ☐ Guilty | ☐ Not Guilty | ☐ Dismissed | Reporting Code | _____ |

**DISPOSITION (select one or more) (Toplock & LOP Sanctions End at 6:00 am)**

| | | Begins | Ends | | |
|---|---|---|---|---|---|
| _____ | Days of Detention | | | Days Credit | |
| _____ | Days Top Lock | _____ | _____ | Hours Extra Duty | |
| 21 | Days Loss of Privileges | 11/08/2016 | 11/29/2016 | $ | Restitution |

| Misconduct Hearing Report personally handed to Prisoner by Hearing Officer on this date: _____ (Check if Applies) ☐ | Hearing Report given to Staff Member by Hearing Officer for Delivery to Prisoner this date: **9/26/2016** (Check if Applies) ☒ |
|---|---|
| Date of Hearing **09/26/2016** | Name of Staff Member  **Capt. D. Peterson** |

| Hearing Officer's Name | Hearing Officer's Signature | Date |
|---|---|---|
| Thomas O. Mohrman  040 | *Thomas O. Mohrman* | 9/26/2016 |

(*Id.*)

    The factfinder (Hearing Officer (HO) Thomas Mohrman) provided a written explanation for why he was finding Finley guilty.  (ECF No. 84-2, PageID.379.)  HO Thomas stated that Finley "was able to control his actions and conform to dept. rules and procedures. [H]e did not."  (*Id.*)

Finally, the day after being found guilty at the misconduct hearing, Finley was taken to an SCC hearing that was convened to determine whether Finley should be placed into administrative segregation. (ECF No. 88-9, PageID.815-817.) Based on these facts, the undersigned concludes there is no genuine issue of material fact that Finley was provided adequate procedural protections surrounding his initial reclassification into administrative confinement.[5]

### ii.  The SCC Hearing Held on October 10, 2016

The undersigned, however, concludes that a genuine issues of fact does exist with respect to the October SCC hearing.   The misconduct ticket dated October 5, 2016, which triggered the October SCC meeting, is shown below. (ECF No 84-2, PageID.388.)

---

[5]    Finley also claims that his rights under the Fourteenth Amendment were violated because he did not receive periodic reviews. (ECF No. 88, PageID.572.) The record shows that immediately after this reclassification, Finley was held in administrative segregation for two days. (*See* ECF No. 84-2, PageID.366; *see also* ECF No. 84-3, PageID.427.) On the September 28, Finley gained access to a razor and began cutting himself. (*See* ECF No. 84-3, PageID.427; ECF No. 88-5, PageID.734.) On September 29, Finley swallowed a razor blade, which resulted in him being airlifted to the University of Michigan's hospital. (ECF No. 84-3, PageID.427.) Finley returned to MBP from the hospital on October 5, 2016 and was then held under observation until being reclassified back into administrative segregation on October 10, 2016. (*See* ECF No. 84-2, PageID.366; *see also* ECF No. 84-8, PageID.495.)

**MICHIGAN DEPARTMENT OF CORRECTIONS** Q2  MBP   10/10  CSJ-228 / 4835-3228
**MISCONDUCT REPORT**

| Prisoner Number: 266147 | Prisoner Name: Finley | | Facility Code: URF | Lock: Q-23 | Violation Date: 10-5-16 |

| Time and Place of Violation: 0110  Q-23 | Contraband Removal Record Provided to Prisoner? ☐ Yes  Date ____ ☒ N/A |

Misconduct Class: ☐ I  ☒ II  ☐ III    Charge(s): Disobeying a Direct Order

Describe Violation (If contraband involved, describe in detail; identify any other credible witnesses):

At the above time and place I gave prisoner Finley #266147 a direct order standing no more than two feet away and with direct eye contact to come to the door to be restrained and be moved to Q-5. Finley replied, "No I'm not going". I then repeated my order to return to come to the door to be restrained and be moved to Q-5. At no time did Finley comply with my reasonable order.

ID'd by MDOC ID card.

Reporting Staff Member's Name (Print): C/O Benson    Reporting Staff Member's Signature    Date and Time Written 10/5/16 0400

**REVIEW**

Location/Verification/Condition of Evidence: Misconduct re-reviewed on 10-5-16 at 1632 to elevate to Class I. copy given to prisoner. S/L James...

Elevated to Class I at review? ☐ No ☒ Yes   If 'yes', explain reason: Prisoner refused to move when ordered. Shows...

**COMPLETE THIS SECTION ONLY FOR REVIEW OF CLASS I MISCONDUCT**

Status Pending Hearing: ☒ Bond  ☐ Non-Bond List   ☐ Segregation  ☐ Bond Revoked (must give reason)  ☒ Confinement to Cell/Room  ☒ Other: currently seg status
Reason if Non-Bond:

Date and Time Given this Status: 10-5-16 0830   Who Notified in Housing Unit or Status? C/O Benson

Hearing Investigator Requested? ☐ No ☒ Yes   Witnesses Requested? ☐ No ☒ Yes  If yes, list: Prisoner will provide

Relevant Documents Requested? ☒ No ☐ Yes  If yes, list: Prisoner will provide

Additional Comments: No comments    Prisoner Waives 24 Hour Notice of Hearing? ☐ No ☒ Yes  Hearing Date: 10-6-16

Reviewing Officer's Name (Print): T. M. Trotter    Reviewing Officer's Signature    Review Date and Time 10-5-16 0349

I have received a copy of this report. My signature does not necessarily mean that I agree with the report. ☒ Prisoner refused to sign. Copy given to prisoner.   Prisoner's Signature: Unable to sign copy posted for trans.

(*Id.*)

The ticket appears to indicate that Finley received adequate notice of the misconduct hearing on this ticket. Finley attested that he was not permitted to attend the related SCC hearing on October 10. (ECF No. 88-4, PageID.711.) As discussed in the beginning of this section, it is unclear what protections a prisoner is entitled to receive relating to an SCC meeting. But, here, Finley was not given the

31

chance to attend.  Thus, the undersigned concludes that a genuine issue of material fact exists with respect to this particular Fourteenth Amendment due process claim.

### iii.  Periodic Reviews

Finley challenges the meaningfulness of these interviews.  Based on the record, Finley received multiple MDOC Segregation Behavior Reviews while he was in administrative segregation.  (*See* ECF No. 84-2, PageID.393-400 (documenting MDOC Segregation Behavior Reviews on October 27, 2016; November 3, 10 and 17, 2016; December 1 and 29, 2016; and January 11, 2017).) (See ECF No. 84-2, PageID.393-400.)  Each review document includes a specific statement regarding Finley's condition.  The undersigned concludes that there are no genuine issues of fact regarding the meaningfulness of these periodic reviews.

## VIII.  Finley's Disability Discrimination Claim under the ADA

Finley's complaint states that he is asserting one claim for disability discrimination under the ADA, 42 U.S.C. § 12131.  For the following reasons, the undersigned concludes that there is no genuine issue of fact that Finley failed to establish his ADA claim.

The ADA prohibits public entities from discriminating against a qualified individual with a disability on account of that disability in the operation of services, programs, or activities.  42 U.S.C. § 12131(1); *Pa. Dep't of Corr. v. Yeskey*, 524 U.S. 206, 210 (1998).  The ADA is applicable to state and local government entities, including prisons and county jail facilities.  *See Yeskey*, 524 U.S. at 210 (holding that the term "public entity" includes prison facilities); *Tucker v. Tenn.*, 539 F.3d 526, 529

(6th Cir. 2008) *overruled in part by Anderson v. City of Blue Ash*, 798 F.3d 338, 357 n.1 (6th Cir. 2015).[6] Title II's implementing regulations provide that "[a] public entity shall make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the services, program, or activity." 28 C.F.R. § 35.130(b)(7).

For a claim of intentional discrimination under the ADA, the Court uses the familiar burden-shifting analysis established by *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973). "Under *McDonnell Douglas,* [a] [p]laintiff must first establish a prima facie case of discrimination." *Turner v. City of Englewood,* 195 F. App'x 346, 353 (6th Cir.2006). To establish a prima facie case of intentional discrimination, a plaintiff must show (1) a disability; (2) that the plaintiff is otherwise qualified; and (3) the plaintiff was being excluded from participation in, denied the benefits of, or subjected to discrimination under the program because of her disability. *Tucker,* 539 F.3d at 532. In establishing a prima facie case, a plaintiff must present evidence showing intentional discrimination because of his disability. *Anderson,*798 F.3d at 356-357. "In other words, the plaintiff must show that the defendant took action because of the plaintiff's disability, i.e., the '[p]laintiff must present evidence that

---

[6]    The third element in *Tucker* required a showing that the discrimination be "solely" because of the disability. *Tucker*, 539 F.3d at 535. *Anderson* simply removed the sole-causation requirement. 798 F.3d at 357 n. 1.

animus against the protected group was a significant factor in the position taken by the municipal decision-makers themselves or by those to whom the decision-makers were knowingly responsive.'" *Id.* (citing *Turner*, 195 F. App'x at 353).

After a plaintiff establishes a prima facie case of discrimination, the burden shifts to defendant to establish a legitimate, nondiscriminatory reason for the conduct taken. *Sjostrand v. Ohio State Univ.,* 750 F.3d 596, 599 (6th Cir. 2014). Once a legitimate nondiscriminatory reason is asserted by Defendant, the burden shifts back to the plaintiff who must show that the asserted reason is a pretext for discriminatory conduct. As the Sixth Circuit has explained, after a defendant presents a legitimate and nondiscriminatory reason for the challenged action, "one of production, not persuasion—[the plaintiff] must then present evidence allowing a jury to find that the [defendant's] explanation is a pretext for unlawful discrimination." *Id.*

The parties do not dispute that Finley is disabled. Instead, their disagreement centers around whether Finley was discriminated against because of his disability. Defendants argue that there is no evidence that Finley was discriminated against by because of his mental health, and that their decision to place and hold Finley in administrative segregation was a result of Finley's conduct. (ECF No. 84, PageID.356.) In response, Finley explains that he did suffer disability discrimination because his misconduct is inextricably linked to his disability. (ECF No. 88, PageID.574-578.) For the following reason, undersigned concludes that that there is no genuine issue of fact that Defendants did not discriminate against Finley because of his disability.

Defendants direct the Court's attention to Huss's testimony (ECF No. 84-5), Salmi's testimony (ECF No. 84-6), and Finley's misconduct record (ECF No. 84-2, PageID.402-411) to show that their decision to place Finley into administrative confinement was based on Finley's conduct. (*Id*.) Huss explains that administrative segregation was the best place for Finley because the restricted access may help prevent Finley from accessing razors to engage in self-mutilation. (ECF No. 84-5, PageID.455.) Salmi states that Finley was aware of his conduct, that his conduct was calculated, and that his conduct was intended to manipulate MDOC into placing him in ICP. (ECF No. 84-6, PageID.468.) She added that when Finley "got on the [ICP] wait list … he just settled right down." (*Id*.) Finally, Finley's misconduct record is extensive. (*See* ECF No. 84-2, PageID.402-411.) As of June 15, 2018, Finley was administratively adjudicated guilty of 340 different misconducts, which included possession of a dangerous weapons, assault and battery, threatening behavior, disobeying orders, and sexual misconduct. (*Id*.)

Finley directs the Court's attention to his experts' reports (ECF Nos. 88-2, 88-3). (ECF No. 88, PageID.575.) According to Dr. Terry Kupers, Finley's self-harming behavior is "certainly a symptom of a serious mental illness, and the disability is marked." (ECF No. 88-2, PageID.625.) Moreover, Mr. Dan Pacholke described "finding [Finley] guilty of possession of a weapon is unnecessary and extreme." (ECF No. 88-3, PageID.667.) Pacholke also states that "the administrative segregation placement was unnecessarily restrictive, and it caused his mental health to further decompensate." (*Id*., PageID.678.)

35

Although Finley's experts seek to establish that his conduct and mental illness are intertwined, the evidence shows that Finley's on-going misconduct and ability to access razorblades made him very difficult to manage in general population. But more importantly, Defendants have provided a legitimate, non-discriminatory reason for their decision to place Finley in administrative segregation, as required by the *McDonnell-Douglas* burden-shifting framework. And Finley has not alleged that Defendants' explanation is a pretext.

Here, the Court faces a situation similar to that presented in *Censke v. Cty. of Marquette*, No. 2:11-CV-119, 2013 WL 4499265 (W.D. Mich. Aug. 20, 2013). In Censke, this Court granted summary judgment for defendants regarding an inmate's ADA and RA claims based on discrimination due to his mental illness. This Court explained that summary judgment was appropriate because "the record clearly shows that Plaintiff's treatment while confined at the Marquette County Jail was the result of his own behavior", which included "an extensive history of misconduct during the pertinent time period." *Censke*, 2013 WL at *9.[7]

The undersigned concludes that there is no genuine issue of fact regarding the question of whether Defendants' decision to place Finley into administrative segregation was discriminatory. Defendants have provided a legitimate and non-discriminatory reason for their decision, and Finley has failed allege facts showing

---

[7]    The undersigned notes that the decision in *Censke* does not articulate the then-newly defined differences between ADA and RA claims in *Lewis v. Humboldt Acquisition Corp.*, 681 F.3d 312, 317 (6th Cir. 2012) (holding that a disability discrimination claim under the ADA, unlike under the RA, does not require the discrimination to be solely based on the disability).

this explanation was a pretext.  And, because there is no genuine issue that Finley

failed to establish that Defendants intentionally discriminated against Finley, the

undersigned concludes that he has failed to show a lack of reasonable accommodation.

*See Tucker*, 539 F.3d at 533.

Accordingly,  the  undersigned  respectfully  recommends  the  Court  grant

summary judgment as to Finley's ADA claim.

## IX.    Disability Discrimination under the RA

Finley's amended complaint states that he is asserting one claim for disability

discrimination under Section 504 of the Rehabilitation Act of 1973 (RA), 29 U.S.C. §

794(a).  Like a claim under the ADA, the RA states, in pertinent part:

> No otherwise qualified individual with a disability in the
> United States ... shall, solely by reason of her or his
> disability, be excluded from the participation in, be denied
> the benefits of, or be subjected to discrimination under any
> program   or   activity   receiving   Federal   financial
> assistance....

29 U.S.C. § 794(a).  To establish a cognizable claim under the RA, the plaintiff must

show "(1) that he is disabled; (2) that he was otherwise qualified for the position; (3)

that he was excluded *solely* by reason of his disability; (4) and that the relevant

program is receiving federal financial assistance."  *Doe v. Salvation Army in U.S.*,

531 F.3d 355, 358 (6th Cir. 2008) (emphasis added) (citing *Sandison v. Michigan High

Sch. Athletic Ass'n, Inc.*, 64 F.3d 1026, 1030–31 (6th Cir. 1995).  Here, unlike

disability discrimination claims under the ADA, plaintiffs must establish that they

were discriminated against "solely" on the basis of their disability.

For the same reasoning in Section VII, the undersigned concludes that Finley failed to establish a genuine issue of fact as to whether Defendants violated the RA by discriminating against him because of his mental illness.

## X.    Defendants' Qualified Immunity Argument

As an alternative argument, Defendants move to dismiss Finley's constitutional claims by asserting qualified immunity from liability.  The undersigned again acknowledges that Defendants were faced with a difficult dilemma: what to do with a mentally ill prisoner who refused to follow prison rules and could not be housed in the general prison population.  Finley argues that Defendants could have placed him into a mental health unit and receive ICP, but Defendants chose to place him in administrative segregation.  It should be noted from the outset that there is no evidence in the record to indicate whether Finley's alternative was available under the circumstances – i.e. ICP's capacity, the number of prisoners already in ICP, and the severity of Finley's need for ICP as compared to those already in ICP.  For the following reasons, the undersigned concludes that Finley's constitutional claims are barred by the doctrine of qualified immunity.

"Under the doctrine of qualified immunity, 'government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"  *Phillips v. Roane Cty.*, 534 F.3d 531, 538 (6th Cir. 2008) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  Once a defendant raises the qualified immunity defense, the burden shifts to the

plaintiff to demonstrate that the defendant officer violated a right so clearly established "that every 'reasonable official would have understood that what he [was] doing violate[d] that right.'"  *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)).  The analysis entails a two-step inquiry.  *Martin v. City of Broadview Heights*, 712 F.3d 951, 957 (6th Cir. 2013).  First, the court must "determine if the facts alleged make out a violation of a constitutional right."  *Id.* (citing *Pearson v. Callahan*, 555 U.S. 223, 232 (1982)).  Second, the court asks if the right at issue was "'clearly established' when the event occurred such that a reasonable officer would have known that his conduct violated it."  *Id.* (citing *Pearson*, 555 U.S. at 232).  A court may address these steps in any order.  *Id.* (citing *Pearson*, 555 U.S. at 236).  A government official is entitled to qualified immunity if either step of the analysis is not satisfied.  *See Citizens in Charge, Inc. v. Husted*, 810 F.3d 437, 440 (6th Cir. 2016).

In applying the first step of the qualified immunity analysis, a court must identify "the specific constitutional right allegedly infringed" and determine whether a violation occurred.  *Graham v. Connor*, 490 U.S. 386, 394 (1989).  The court considers the state of the law at the second step.  As the Supreme Court has observed, "this Court's case law does not require a case directly on point for a right to be clearly established, [but] existing precedent must have placed the statutory or constitutional question beyond debate."  *White v. Pauly*, 137 S. Ct. 548, 551 (2017) (internal quotation marks and original brackets omitted) (quoting *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015)).  As explained by the Supreme Court:

39

To be clearly established, a legal principle must have a sufficiently clear foundation in then-existing precedent. The rule must be "settled law," *Hunter v. Bryant*, 502 U.S. 224, 228, 112 S.Ct. 534, 116 L.Ed.2d 589 (1991) (per curiam), which means it is dictated by "controlling authority" or "a robust 'consensus of cases of persuasive authority,' " *al–Kidd*, *supra*, at 741–742, 131 S.Ct. 2074 (quoting *Wilson v. Layne*, 526 U.S. 603, 617, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999)). It is not enough that the rule is suggested by then-existing precedent. The precedent must be clear enough that every reasonable official would interpret it to establish the particular rule the plaintiff seeks to apply. *See Reichle*, 566 U.S., at 666, 132 S.Ct. 2088. Otherwise, the rule is not one that "every reasonable official" would know. *Id.*, at 664, 132 S.Ct. 2088 (internal quotation marks omitted).

The "clearly established" standard also requires that the legal principle clearly prohibit the officer's conduct in the particular circumstances before him. The rule's contours must be so well defined that it is "clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier v. Katz*, 533 U.S. 194, 202, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). This requires a high "degree of specificity." *Mullenix v. Luna*, 577 U.S. ——, ——, 136 S.Ct. 305, 309, 193 L.Ed.2d 255 (2015) (per curiam). We have repeatedly stressed that courts must not "define clearly established law at a high level of generality, since doing so avoids the crucial question whether the official acted reasonably in the particular circumstances that he or she faced." *Plumhoff*, *supra*, at 2023 (internal quotation marks and citation omitted). A rule is too general if the unlawfulness of the officer's conduct "does not follow immediately from the conclusion that [the rule] was firmly established." *Anderson*, *supra*, at 641, 107 S.Ct. 3034. In the context of a warrantless arrest, the rule must obviously resolve "whether 'the circumstances with which [the particular officer] was confronted ... constitute[d] probable cause.'" *Mullenix*, *supra*, at 309 (quoting *Anderson*, *supra*, at 640–641, 107 S.Ct. 3034; some alterations in original).

*D.C. v. Wesby*, 138 S. Ct. 577, 589–90 (2018).

For the reasons elaborated in Section V, Finley has established a cognizable Eighth Amendment claim to be free from cruel and usual punishment.  Therefore, the undersigned turns to whether, at the time of the Defendants' conduct, it was clearly established that a mentally ill prisoner had a right to not be placed into administrative segregation.  Finley bears the burden of answering the question in the affirmative.  *Ashcroft*, 563 U.S. at 741.  In Finley's response, he advances four arguments for why this Court should conclude that it is settled law that Defendants' conduct would violate Finley's Eighth Amendment rights: (1) specific United States Supreme Court precedents establish the required settled law, (2) specific Sixth Circuit precedents establish the required settled law, (3) a consensus of persuasive authorities establish the required settled law, and (4) the MDOC policies gave fair warning to a reasonable person about the unconstitutional nature of Defendants' conduct.  (ECF No. 88, PageID.578-584.)  The undersigned disagrees.

Finley's first two arguments miss the mark for the same reasons.  None of the United States Supreme Court or Sixth Circuit's decisions address whether placing a mentally ill person in administrative segregation and holding him there amounts to an Eighth Amendment violation.[8]  The Supreme Court cases cited by Finely noted the potential dangers of solitary confinement and held that certain conditions of confinement can violate the Eighth Amendment.  *See In re Medley*, 134 U.S. 160, 168

---

[8]    The undersigned acknowledges that Justice Kennedy's concurrence in *Davis v. Ayala*, 135 S. Ct. 2187, 2210 (2015) and Justices Breyer and Ginsberg's dissent in *Glossip v. Gross*, 135 S. Ct. 2726, 2765 (2015) question the constitutionality of holding a mentally ill prisoner in solitary confinement, but those opinions are not precedential for purposes of a qualified immunity analysis.

(1890); *Hutto v. Finney*, 437 U.S. 678, 685 (1978); *see also Estelle*, 429 U.S. at 102–04; *Farmer*, 511 U.S. at 834; *Rhodes v. Chapman*, 452 U.S. 337, 346 (1981). The Sixth Circuit cases cited by Finley held that defendants were liable for Eighth Amendment violations generally when they were deliberately indifferent to serious medical dangers. *See Dominguez v. Correctional Medical Services*, 555 F.3d 543, 552 (6th Cir. 2009); *Estate of Carter v. City of Detroit*, 408 F.3d 305, 313 (6th Cir. 2005); *Heflin v. Stewart County, Tenn.*, 958 F.2d 709, 717 (6th Cir. 1992); *Danese v. Asman*, 875 F.2d 1239, 1244 (6th Cir. 1989). But these cases do not address the situation presented here. Moreover, to accept Finley's arguments runs the risk of collapsing the "two qualified-immunity inquiries into one, permitting the constitutional-violation inquiry always to answer the clearly established inquiry." *Kent*, 810 F.3d 384, 396.

The authorities cited by Finley also do not constitute a "*robust* consensus of cases of persuasive authority." *Wesby*, 138 S. Ct. at 589-90 (citing *al–Kidd*, 563 U.S. at 741–742) (internal quotation omitted) (emphasis added). The "consensus of cases of persuasive authority [must be] such that a reasonable officer could not have believed that his actions were lawful." *Wilson v. Layne*, 526 U.S. 603, 617 (1999). Half of the cases cited by Finley come from the district courts in different federal circuits. It would be unreasonable to expect that those cases would make a reasonable officer in Michigan aware of the unconstitutional nature of his or her conduct. The other half of the cases arise out of four federal circuits: the Second, Fourth, Fifth, and Seventh. Thus, nine of the federal circuits have not addressed whether placing a mentally ill prisoner into administrative segregation amounts to

an Eighth Amendment violation.  Consequently, in the opinion of the undersigned, it cannot be said that there is a robust consensus of cases that places the constitutional question here beyond debate.

Finally, as to Finley's fourth argument, the United States Supreme Court explained:

> Even if an officer acts contrary to her training, however, (and here, given the generality of that training, it is not at all clear that Reynolds and Holder did so), that does not itself negate qualified immunity where it would otherwise be warranted. Rather, so long as "a reasonable officer could have believed that his conduct was justified," a plaintiff cannot "avoi[d] summary judgment by simply producing an expert's report that an officer's conduct leading up to a deadly confrontation was imprudent, inappropriate, or even reckless." *Billington*, supra, at 1189.

*City & Cty. of San Francisco, Calif. v. Sheehan*, 575 U.S. 600, 135 S. Ct. 1765, 1777 (2015).  As discussed in the analysis regarding Finley's Fourteenth Amendment due process claim, there is ample evidence in the record as to why Defendants would have believed their conduct to be justified.

Also, for reasons elaborated in Section VII, Finley has failed to establish that Defendants in this case violated a clearly constitutionally established right under the Fourteenth Amendment.  As a result, the doctrine of qualified immunity also bars Finley's Fourteenth Amendment due process claim.

## XI.    Finley's Motion to Unseal Exhibit 18

In this case, the Court authorized the filing under seal of Plaintiff's exhibit 18 (ECF No. 88-19 (placeholder filed with response to motion for summary judgment);

ECF No. 90 (19 photographs comprising Plaintiff's exhibit 18, which are currently sealed).)  (ECF No. 91 (order authorizing the filing of exhibits under seal).)

Plaintiff now moves to unseal his exhibit 18.  (ECF No. 93.)  Defendants oppose the unsealing of the first 18 photographs comprising exhibit 18, but do not oppose the unsealing of the last photograph in the collection, which is identified as MDOC_1325.  (ECF No. 98.)  Defendants explain that the first 18 photographs should remained sealed due to institutional security concerns.  (*See* ECF No. 98-2 (affidavit of MBP Inspector Hoult).)

Pursuant to W.D. Mich. LCivR 10.6(b), "[d]ocuments may be submitted under seal only if authorized by statute or by the court for good cause shown."  In *Shane Group, Inc. v. Blue Cross Blue Shield of Michigan*, the Sixth Circuit explained as follows:

> The courts have long recognized, therefore, a "strong presumption in favor of openness" as to court records.  The burden of overcoming that presumption is borne by the party that seeks to seal them.  The burden is a heavy one: "Only the most compelling reasons can justify non-disclosure of judicial records."  Moreover, the greater the public interest in the litigation's subject matter, the greater the showing necessary to overcome the presumption of access.  For example, in class actions—where by definition "some members of the public are also parties to the [case]"—the standards for denying public access to the record "should be applied ... with particular strictness."  And even where a party can show a compelling reason why certain documents or portions thereof should be sealed, the seal itself must be narrowly tailored to serve that reason. The proponent of sealing therefore must "analyze in detail, document by document, the propriety of secrecy, providing reasons and legal citations."

825 F.3d 299, 305-06 (6th Cir. 2016) (citations omitted).

44

In addition, a court authorizing the sealing of documents must explain why non-disclosure to the public is justified.  *Id*. at 306.  "[A] court's obligation to explain the basis for sealing court records is independent of whether anyone objects to it."  *Id*.

The undersigned has reviewed the 19 photographs comprising Plaintiff's exhibit 18 and Inspector Hoult's explanation for why all but the last photograph in the series (MDOC_1325) should remain sealed.  Each of the first 18 photographs depicts some perspective of prison layout, cell size and location relative to other parts of the prison, locking mechanisms, or locations of windows and doors.  As noted in *Napier v. Cty. of Washtenaw*, "maintaining internal security is of the utmost concern in a jail or prison setting."  No. 11-CV-13057, 2013 WL 1395870, at *11 (E.D. Mich. Apr. 5, 2013) (authorizing photographs of the inside of a jail to be filed under seal). Inspector Hoult has attested that disclosure of this type of information – i.e., prison layout, locking mechanisms, locations of windows and doors, etc. – would cause "a negative impact on the safety and security of staff and inmates."  (ECF No. 98-2, PageID.1563.)  Accordingly, the undersigned will deny Finley's motion to unseal the first 18 photographs comprising his exhibit 18, but will allow the final photograph in the series (MDOC_1325) to be unsealed.

## XII.    Recommendation

The undersigned respectfully recommends that this Court grant Defendants' motion for summary judgment, grant Finley's motion as all photographs comprising exhibit 18 except the final photograph, and dismiss Finley's claims with prejudice.  If the Court accepts this report and recommendation, the case will be dismissed.

Dated:   September 21, 2020                    /s/ *Maarten Vermaat*
                                              MAARTEN VERMAAT
                                              U. S. MAGISTRATE JUDGE


## NOTICE TO PARTIES

Any objections to this Report and Recommendation must be filed and served within fourteen days of service of this notice on you.  28 U.S.C. § 636(b)(1)(C); FED. R. CIV. P. 72(b).  All objections and responses to objections are governed by W.D. Mich. LCivR 72.3(b).  Failure to file timely objections may constitute a waiver of any further right of appeal.  *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *see Thomas v. Arn*, 474 U.S. 140 (1985).